# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SHAUNTAYE M. G., | ) | NO. ED CV 20-55-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ANDREW SAUL, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PROCEEDINGS

Plaintiff filed a complaint on January 8, 2020, seeking review of the Commissioner's denial of benefits.  On February 4, 2020, the parties consented to proceed before a United States Magistrate Judge. Plaintiff filed a motion for summary judgment on May 27, 2020. Defendant filed a motion for summary judgment on August 3, 2020.  The Court has taken the motions under submission without oral argument. See L.R. 7-15; "Order," filed January 13, 2020.

///

///

**BACKGROUND**

On April 26, 2016, Plaintiff filed applications for Supplemental Security Income and Disability Insurance Benefits, asserting disability since May 5, 2013, based on alleged bipolar disorder/depression, brain lesions, degenerative joint disease in the back, scoliosis, anxiety and gastric problems (Administrative Record ("A.R.") 18, 196-203, 212).

An Administrative Law Judge ("ALJ") examined the record and heard testimony from Plaintiff and a vocational expert (A.R. 18-66).  The ALJ found that Plaintiff has "severe" impairments (_i.e._, bipolar disorder, anxiety disorder and mild degenerative disc disease of the lumbar spine) (A.R. 20).  The ALJ also found that Plaintiff has a residual functional capacity to perform light work, limited to: (1) simple routine tasks; (2) no jobs at a production rate pace, such as an assembly line; (3) simple work-related decisions; (4) few changes in the work place; and (5) occasional contact with supervisors and coworkers, and no direct contact with the public (A.R. 22-30).  The ALJ determined that there are light work jobs existing in significant numbers which Plaintiff can perform.  See A.R. 30-31 (adopting vocational expert testimony at A.R. 62-63).  Accordingly, the ALJ denied benefits (A.R. 31).

The Appeals Council considered additional vocational evidence submitted by Plaintiff (see A.R. 308-22).  However, the Appeals Council denied review (A.R. 1-6).

///

2

1                          **STANDARD OF REVIEW**

2

3          Under 42 U.S.C. section 405(g), this Court reviews the

4    Administration's decision to determine if: (1) the Administration's

5    findings are supported by substantial evidence; and (2) the

6    Administration used correct legal standards.  <u>See</u> <u>Carmickle v.</u>

7    <u>Commissioner</u>, 533 F.3d 1155, 1159 (9th Cir. 2008); <u>Hoopai v. Astrue</u>,

8    499 F.3d 1071, 1074 (9th Cir. 2007); <u>see also</u> <u>Brewes v. Commissioner</u>,

9    682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such

10   relevant evidence as a reasonable mind might accept as adequate to

11   support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401

12   (1971) (citation and quotations omitted); <u>see also</u> <u>Widmark v.</u>

13   <u>Barnhart</u>, 454 F.3d 1063, 1066 (9th Cir. 2006).

14

15          If the evidence can support either outcome, the court may

16          not substitute its judgment for that of the ALJ.  But the

17          Commissioner's decision cannot be affirmed simply by

18          isolating a specific quantum of supporting evidence.

19          Rather, a court must consider the record as a whole,

20          weighing both evidence that supports and evidence that

21          detracts from the [administrative] conclusion.

22

23   <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and

24   quotations omitted).

25

26          Where, as here, the Appeals Council "considers new evidence in

27   deciding whether to review a decision of the ALJ, that evidence

28   becomes part of the administrative record, which the district court

must consider when reviewing the Commissioner's final decision for
substantial evidence." <u>Brewes v. Commissioner</u>, 682 F.3d at 1163.
"[A]s a practical matter, the final decision of the Commissioner
includes the Appeals Council's denial of review, and the additional
evidence considered by that body is evidence upon which the findings
and decision complained of are based." <u>Id.</u> (citations and quotations
omitted).[1]  Thus, this Court has reviewed the evidence submitted for
the first time to the Appeals Council.

**DISCUSSION**

Plaintiff takes issue with the ALJ's evaluation of Plaintiff's
mental impairments and with the ALJ's vocational findings.
Specifically, Plaintiff argues that the ALJ erred in: (1) evaluating
the opinions of treating psychiatrist Dr. Michael Chang, psychiatric
consultative examiner Dr. Khushro Unwalla and the state agency
physicians; and (2) relying on the vocational expert's testimony that
the jobs performable by a person having Plaintiff's limitations exist
in significant numbers.  <u>See</u> Plaintiff's Motion, pp. 9-14; <u>see also</u>

---

[1]     And yet, the Ninth Circuit sometimes had stated that
there exists "no jurisdiction to review the Appeals Council's
decision denying [the claimant's] request for review."  <u>See,
e.g.</u>, <u>Taylor v. Commissioner</u>, 659 F.3d 1228, 1233 (9th Cir.
2011); <u>but see</u> <u>Smith v. Berryhill</u>, 139 S. Ct. 1765 (2019) (court
has jurisdiction to review Appeals Council's dismissal of request
for review as untimely); <u>see also</u> <u>Luther v. Berryhill</u>, 891 F.3d
872, 875-76 (9th Cir. 2018) (refusing to consider the reasoning
expressed by the Appeals Council in denying review where no
additional evidence had been made a part of the administrative
record); <u>Warner v. Astrue</u>, 859 F. Supp. 2d 1107, 1115 n.10 (C.D.
Cal. 2012) (remarking on the seeming irony of reviewing an ALJ's
decision in the light of evidence the ALJ never saw).

4

1  A.R. 308-21.

3     After consideration of the record as a whole, Defendant's motion
4  is granted and Plaintiff's motion is denied.  The Administration's
5  findings are supported by substantial evidence and are free from
6  material[2] legal error.  Plaintiff's contrary arguments are unavailing.

8  **I.   Summary of the Relevant Medical Record[3]**

10    Although Plaintiff alleges a disability onset date of May 5,
11 2013, the record contains no treatment documents concerning mental
12 problems before 2015.  See A.R. 350-52.  In February of 2015,
13 Plaintiff first reported depression and anxiety to a pain management
14 doctor who prescribed Cymbalta to help with pain and depression.
15 See A.R. 371, 377, 382 (describing Plaintiff's depression and anxiety
16 as being due to her pain).  Although Plaintiff also reported
17 depression and anxiety at subsequent pain management visits in 2015
18 and 2016, after her insurance had failed to cover Cymbalta, her pain
19 management doctor provided no specific treatment for depression or
20 anxiety (A.R. 385, 391, 396-97, 405, 410-11).  Depression is not
21 mentioned in primary care records during this time period (A.R. 350-
22 70, 441-75).  However, when Plaintiff applied for disability benefits

24    [2]   The harmless error rule applies to the review of
25 administrative decisions regarding disability.  See Garcia v.
   Commissioner, 768 F.3d 925, 932-33 (9th Cir. 2014); McLeod v.
26 Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011).

27    [3]   Since Plaintiff does not take specific issue with the
   ALJ's evaluation of Plaintiff's physical impairments, the Court
28 has not detailed the record of treatment for those impairments.

5

in April of 2016, she reported suffering from depression, anxiety and "bipolar" (A.R. 212).

Consultative examiner Dr. Khushro Unwalla prepared a Complete Psychiatric Evaluation for Plaintiff dated July 29, 2016 (A.R. 345-49). Plaintiff reportedly was very irritable, had started fighting with her mother in the waiting room and had been abrupt and irritable with staff (A.R. 345). Plaintiff reportedly was angry, impulsive, and rude and appeared to have severe psychomotor agitation with abrupt speech (A.R. 345). During her evaluation, however, Plaintiff reportedly was engaged and cooperative (A.R. 345). Plaintiff complained of severe psychomotor agitation, irritability, hostility, mood swings and anxiety, reporting that the entire way to the appointment she had felt like she was going to die in a car crash (A.R. 345). During the evaluation, Plaintiff reportedly was labile, on edge and agitated (A.R. 345). Plaintiff claimed she was taking Xanax and yet she was not seeing a psychiatrist (A.R. 345-46).

Plaintiff asserted a history of mental illness since the age of 12, treatment including a psychiatric hospitalization when she was 14 years old, a history of arrests and jailings as a minor, and a diagnosis of bipolar disorder for which she had been prescribed medications including Effexor, Lithium and Mellaril (A.R. 346). She reported a history of cutting herself, paranoia, auditory and visual hallucinations, impulse control problems, violent and chaotic behavior, losing custody of her children, homelessness and an inability to get along with others (A.R. 346). Yet, Plaintiff had a history of adequate self-care skills and was able to do limited

1   errands, shop, cook, drive and play video games (A.R. 347).

2

3       On mental status examination, Plaintiff reportedly was
4   cooperative and maintained good eye contact (A.R. 347).  Her mood was
5   labile and irritable, and she reportedly had abrupt/loud speech,
6   reactive affect, disorganized thought process, paranoid ideation,
7   psychotic anxiety, and visual hallucinations (A.R. 347).  Plaintiff
8   related that she felt as if she would die in a car crash, felt people
9   were looking at her, and would "flare up" at anyone who states, "That
10  is not true" (A.R. 347).  Plaintiff reportedly registered one out of
11  three items at five minutes, was unable to do serial sevens and serial
12  threes and was unable to spell "house" backward (A.R. 347-48).
13  According to her presentation, Plaintiff's abstract thinking was
14  impaired and her insight and judgment were poor (A.R. 347-48).
15  Compare A.R. 377, 381, 391, 395, 405, 409 (February, 2015, July, 2015
16  and September, 2016 reports reflecting that Plaintiff's judgment and
17  insight, recent and remote memory, mood and affect were all normal
18  despite Plaintiff's allegations of depression and anxiety).

19

20      Dr. Unwalla diagnosed bipolar disorder (not otherwise specified)
21  and anxiety disorder (not otherwise specified), with a note to rule
22  out schizoaffective disorder (A.R. 348).  Dr. Unwalla assessed a
23  current Global Assessment of Functioning ("GAF") score of 47 (A.R.
24  ///
25  ///
26  ///
27  ///
28  ///

348).[4]  Dr. Unwalla opined that Plaintiff would have moderate
difficulty with concentration, persistence and pace, maintaining
social functioning and focusing and maintaining attention (A.R. 348).
Dr. Unwalla further opined that Plaintiff's level of personal
independence was poor, and she was "intellectually and psychologically
incapable of performing activities of daily living" (A.R. 348).  Dr.
Unwalla opined that Plaintiff would have moderate limitations
performing simple and repetitive tasks, detailed and complex tasks,
performing work activities on a consistent basis without special or
additional supervision, completing a normal workday or workweek,
accepting instructions from supervisors, interacting with coworkers
and with the public, and handling the usual stresses, changes and
demands of gainful employment (A.R. 348).  However, Dr. Unwalla also
opined that, if Plaintiff had treatment, her condition "would
significantly improve" (A.R. 348).  Her prognosis was guarded (A.R.
349).

    State agency psychologist Dr. Dara Goosby (erroneously referred
to by Plaintiff as "Dr. Tanaka," see Plaintiff's Motion, p. 6)
reviewed the record and opined on August 18, 2016 that Plaintiff had
the residual functional capacity to understand and remember simple
instructions, to sustain concentration, persistence and pace for work

---

    [4]    The GAF scale is used by clinicians to report an
individual's overall level of functioning.  See American
Psychological Association, Diagnostic and Statistical Manual of
Mental Disorders 34 (4th ed. 2000).  A GAF of 41-50 indicates
"[s]erious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting), OR any serious impairment in
social, occupational, or school functioning (e.g., no friends,
unable to keep a job)."  Id.

with simple 1-2 step tasks with no public contact, and could adapt to this capacity with no psychiatric treatment (A.R. 67-80).  On reconsideration in October of 2016, psychologist Dr. Preston Davis agreed with the prior findings (A.R. 97-111).

Plaintiff thereafter underwent regular mental health treatment with the Riverside County Department of Mental Health from October of 2016 through at least November of 2018 (A.R. 476-561).  Plaintiff attended weekly therapy visits with a social worker and monthly medication visits with Dr. Michael Chang and other providers (id.). Plaintiff initially presented with a goal of decreasing the symptoms of bipolar disorder with psychotic features, generalized anxiety and post traumatic stress disorder, depression, mania, hallucinations, anxiety and social isolation (A.R. 476).  She reportedly was "stable and compliant with her physical health care including pain management" (A.R. 477).

Dr. Willy Anand prepared an Adult Psychiatric Assessment dated November 4, 2016 (A.R. 551-54).  Plaintiff reported that she had become depressed because of her medical situation, and she complained of depressed mood, irritability, poor sleep, poor concentration and low energy, with a supposed history of bipolar disorder diagnosis when she was a teenager (A.R. 551, 553).  Plaintiff reportedly was treated with Effexor eight years earlier, and supposedly had not received any psychiatric treatment since then (A.R. 551).  She had no evident psychosis, but claimed a history of hallucinations (A.R. 551).  She had a history of drug use, reporting that she last used methamphetamine when she was 20 years old, last used cannabis six

years ago and last used cocaine when she was 20 years old (A.R. 552).
She reportedly was living with her mother and significant other, she
last had attempted to work in retail in 2014, and she was on probation
for a theft-related charge (A.R. 552-53).  Plaintiff's mental status
examination was normal/appropriate with good insight and judgment
(A.R. 553).  Dr. Anand prescribed Celexa and recommended therapy (A.R.
554).

Later in November of 2016, Plaintiff reportedly was stable on
Celexa, with a normal mental status exam (A.R. 485-86).  She
complained of insomnia for which Dr. Anand lowered her Celexa dosage
(A.R. 486).  In December of 2016, Plaintiff again reportedly was
stable with a normal mental status exam, and she said she was
performing activities outside the home and had been compliant with
treatment (A.R. 486-87).

In January of 2017, Plaintiff first met with Dr. Chang (A.R. 487-
88).  Plaintiff reported wide mood swings, sadness, crying, family
problems, housing problems and financial problems (A.R. 487).  She
said that Celexa was causing her to have more anxiety and to become
angry easily (A.R. 487).  On mental status examination, she reportedly
was depressed with labile affect, and she claimed hallucinations
(i.e., "just occasional voices") (A.R. 488).  She reportedly had a
history of a substance induced mood disorder resulting in psychiatric
hospitalization and impairing her social/occupational functioning
(A.R. 488).  She supposedly was adherent to her medications but "non-
responsive," so Dr. Chang switched her medication from Celexa to
Topamax (A.R. 488).  When Plaintiff followed up with a nurse in

February of 2017, Plaintiff said that she was "doing ok" (A.R. 478).

In March of 2017, Plaintiff reported anxiety, back pain, mood swings, anger, depression and sadness (A.R. 488-89).  She reportedly then was homeless, jobless, moneyless and had separated from her husband (A.R. 489).  Plaintiff's mother then was caring for Plaintiff's children (A.R. 489).  Plaintiff reportedly was taking Topamax on an "irregular" basis (A.R. 489).  On mental status examination, she was depressed but all findings were otherwise normal (A.R. 489).  Dr. Chang described Plaintiff as "non-adherent" with medications and instructed her to taper her Topamax as prescribed (A.R. 489-90).[5]

_____

     [5]   Plaintiff began weekly therapy visits in April of 2017 (A.R. 491).  Plaintiff initially presented as anxious with blunt/flat affect and thought perseveration, but had fair judgment/insight (A.R. 491).  She apparently had obtained her medications the day before (A.R. 491).  She reported trauma related to seeing her husband cross-dressing (A.R. 491).

     The following week, Plaintiff reportedly was anxious and disheveled with pressured speech, labile affect, loose thought process with perseveration, and distracted cognition, but had fair insight/judgment (A.R. 492).  She was in "fair spirits," sharing that her husband had moved into her mother's home with her and her children to help financially and that her husband wanted to work on their relationship (A.R. 492).  She did not agree, given her husband's sexual behaviors; she was dating other people (A.R. 492-93).

     The following week, she reportedly was disheveled, irritable and obsessed/preoccupied with her relationships and in poor spirits (A.R. 494).  She reported that everything bothered her, and she was having difficulties at home (A.R. 494-95).  The following week, she reportedly was disheveled with pressured speech, irritable mood and thought perseveration (A.R. 496).  She said she was irritated with her husband and with her boyfriend (A.R. 496).  Plaintiff called her therapist the next day to
                                                    (continued...)

In May of 2017, Plaintiff reportedly exhibited pressured speech, restlessness, anxious/irritable/depressed mood and distracted cognition (A.R. 501).  Plaintiff said that Topamax was working better than other medications and was without side effects (A.R. 501). However, she also claimed problems with constantly running thoughts, insomnia, irritability and mood swings (A.R. 501).  Dr. Chang ordered Plaintiff to increase her Topamax dose over the next two weeks and prescribed Seroquel for sleep, to decrease her running thoughts and to stabilize Plaintiff's mood (A.R. 502).[6]

///

---

[5](...continued)
discuss relationship problems concerning her boyfriend (A.R. 497).

Plaintiff returned for therapy the next week, reportedly in fair spirits with pressured speech, irritable mood, labile affect and thought perseveration (A.R. 499).  She reported issues with her boyfriend and said she was dealing with a lot of stress from migraines and the finding of 8-9 brain lesions on a MRI (A.R. 499).  She reported not being able to schedule her medical appointments, complete Social Security paperwork, or remember to take her medications consistently (A.R. 500).  Her therapist arranged for help for Plaintiff in scheduling appointments, completing her Social Security paperwork and setting medication timers (A.R. 500).

[6]     At her next therapy visit in May of 2017, Plaintiff reportedly was irritable with blunted affect and thought perseveration, but in fair spirits (A.R. 503).  She reported some health concerns regarding a lump in her breast and issues with her husband and her boyfriend (A.R. 503).  Later in May, she reported to her therapist that she had a hard week, was irritated with her husband and had hit him due to her poor self-control (A.R. 506).  She also said that she had an altercation with Del Taco staff for short-changing her (A.R. 506).  Plaintiff admitted that she might be having stronger reactions because she had been without her medications (A.R. 506).  At her last visit in May, Plaintiff reportedly was talkative, irritable per report, but in fair spirits despite continued romantic relationship concerns (A.R. 513).

On May 19, 2017, Dr. Chang stated that Plaintiff had left an "SSI" form to be filled out, but the doctor "could not find enough information in charts to be able to fill out the forms properly" (A.R. 505).[7]  Nonetheless, Dr. Chang did fill out the form entitled Medical Opinion re: Ability to Do Work-Related Activities (Mental) two days later.  At that time, Dr. Chang suggested extreme limitations (A.R. 418-19).  Dr. Chang indicated that Plaintiff would be unable to meet competitive standards for almost all areas of functioning (i.e., maintaining attention for two hour segments, maintaining regular attendance, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, dealing with the stress of semiskilled and skilled work, interacting appropriately with the general public, maintaining socially appropriate behavior and using

---

[7]     Plaintiff reported at a June 27, 2017 therapy visit that she was waiting for SSI benefits and hoping to receive financial assistance (A.R. 521).  She said the reason she could not work was that over half of the wages she earned from working would be taken for child support (A.R. 521).

public transportation) (A.R. 418-19).  As to the remaining areas of
functioning, Dr. Chang indicated limited or seriously limited
abilities (A.R. 418-19).  Dr. Chang stated that Plaintiff's "main
problem is her inability to control her temper due to her Bipolar
Disorder" (A.R. 419).  According to Dr. Chang, Plaintiff has had
behavioral problems since age 12 and was in juvenile hall by age 14
due to her temper (A.R. 419).  Dr. Chang opined that Plaintiff would
miss more than four days of work per month due to her impairments
(A.R. 419).

When Plaintiff returned on May 26, 2017, Dr. Chang indicated that
Plaintiff was talkative, restless, had anxious/irritable/depressed
mood with dysphoric affect, had been off Topamax for several days and
just started taking it again two days prior (A.R. 511).[8]  At her next
regular visit in June of 2017, Plaintiff reportedly was restless,
anxious/depressed with dysphoric affect, had been off Topamax for
several weeks and was experiencing mood swings (A.R. 523).  Dr. Chang
ordered Plaintiff to titrate back up to a regular dose of Topamax

---

[8]     At her first therapy visit in June of 2017, Plaintiff
reportedly was talkative, irritable per report with blunted
affect and thought perseveration, but in fair spirits with the
same relationship concerns (A.R. 515).  At her next visit, she
reportedly was disheveled, talkative, restless, irritable with
thought perseveration, but in fair spirits (A.R. 517).  Plaintiff
reported getting agitated, irritated, frustrated and overwhelmed,
which supposedly caused migraines (A.R. 517).  When she returned
the next week, she reportedly was talkative, irritable with
blunted affect, but in fair spirits (A.R. 519).  Evidently, she
recently had been to court for stealing (A.R. 519).  At her next
visit, she reportedly was irritable with blunted affect, but in
fair spirits, complaining of a migraine and increasing anger
(A.R. 521).

14

(A.R. 524).[9]  In July of 2017, Plaintiff reportedly was anxious/
irritable/depressed with a dysphoric affect and she said that Topamax
was helping to keep her mood stable (A.R. 529).  Her medications were
continued (A.R. 529).[10]

     In August of 2017, Plaintiff said she was anxious, irritable and
depressed (A.R. 533).  Dr. Chang noted that Plaintiff's Topamax was at
a subtherapeutic level, so he increased the dose and added Zoloft
(A.R. 533).  In September of 2017, Plaintiff said she was anxious,
irritable and depressed, but also said that Topamax was keeping her
mood stable at its current dose (A.R. 535).  Her medications were
continued (A.R. 535).

     Dr. Chang prepared an annual assessment in November of 2017 (A.R.
479-84).  Plaintiff reportedly complained of constantly running
thoughts, insomnia, irritability and mood swings, but her main problem
was her "husband's desire to be trans gender [sic]" (A.R. 479).  She
said she had problems controlling her anger/irritation/aggression, and

---

[9]    At her next therapy visit in July of 2017, Plaintiff
reportedly was talkative and irritable, but in fair spirits, and
she was still having relationship issues with her estranged
husband, on whom she relied for financial support (A.R. 525).
She was awaiting a decision in her SSI case so she could change
her situation (A.R. 525).  Plaintiff had not been doing her anger
management homework and reported that she almost got into an
altercation with a woman in a park (A.R. 526).  At her next
visit, she reported being irritable and she mentioned issues with
her living situation (A.R. 527).

[10]    At her next therapy visit in August of 2017, Plaintiff
reportedly was talkative with neutral mood, and fair spirits, and
she said she was dealing with her husband's desire to transition
to transgender (A.R. 531).

she also said she had difficult/intense relationships with others
(A.R. 480).  She admitted a history of substance abuse, but claimed
she had stopped using 10 years before (A.R. 482).  She and her husband
reportedly then were homeless and were moving around from cousin to
cousin (A.R. 482).  She reportedly was also on probation for assault
and drug possession (A.R. 482).

According to a mental status examination, Plaintiff was normal/
responsive, had good eye contact, appropriate speech, sad/depressed/
anxious mood with congruent affect, had suicidal ideation with low
risk, paranoid delusions, auditory hallucinations, fair concentration,
average knowledge and intelligence, partial insight and fair judgment
(A.R. 483).  Dr. Chang assessed Plaintiff as severely depressed with
low self worth, chronic sadness, "negative voic[es]," no desire to
live, irritability and anger impairing her ability to work and to be
sociable (A.R. 484).  Dr. Chang increased Plaintiff's Topomax and
continued her Seroquel (A.R. 484).

At Plaintiff's next visit in January of 2018, Dr. Chang reported
that Remeron and Seroquel were helping Plaintiff sleep, that
irritability was her main problem (for which she was taking Topamax),
and that Plaintiff's neurologist was taking over the prescribing of
Topamax (A.R. 539).  Dr. Chang added a prescription for Risperdal for
anger and irritability (A.R. 540).  In March of 2018, Dr. Chang noted
that Plaintiff was no longer seeing her neurologist, so he added a
Topamax prescription (A.R. 541-42).  In April of 2018, Dr. Chang
increased Plaintiff's Topamax upon observing that Plaintiff's
medication was subtherapeutic (A.R. 543-44).  In May of 2018, Dr.

Chang continued Plaintiff's medications (A.R. 545-46).  In July of
2018, Dr. Chang stated that Plaintiff's new generic Topamax was
causing unwanted side effects, so he continued her medications with a
different brand of Topamax (A.R. 549-50).

II.  **Substantial Evidence Supports the Conclusion that Plaintiff is**
     **Not Disabled By Her Mental Impairments.**

     Substantial evidence supports the conclusion Plaintiff's mental
impairments do not disable her from all employment.  The ALJ
rationally found Plaintiff capable of performing light work, limited
to simple routine tasks, no jobs at a production rate pace, such as an
assembly line, simple work-related decisions, few changes in the work
place, and occasional contact with supervisors, coworkers but no
direct contact with the public (A.R. 22).

     As indicated above, consultative examiner Dr. Unwalla opined that
Plaintiff's reported mental condition would significantly improve with
treatment (A.R. 348).[11]  The state agency physicians reviewed the
medical record prior to Plaintiff receiving any mental health
treatment, and found that, even without treatment, Plaintiff had a
residual functional capacity to understand and remember simple
instructions, and to sustain concentration, persistence and pace for
simple 1-2 step tasks, with no public contact.  See A.R. 67-90, 97-

---

[11]     Some courts have found that moderate mental functional
limitations do not preclude the performance of jobs that involve
simple, repetitive tasks.  See, e.g., McLain v. Astrue, 2011 WL
2174895, at *6 (C.D. Cal. June 3, 2011); Rogers v. Commissioner,
2011 WL 445047, at *11-2 (E.D. Cal. Jan. 25, 2011).

111.  Given the medical records summarized above, these medical
opinions constitute substantial evidence supporting the ALJ's non-
disability determination.  See Orn v. Astrue, 495 F.3d 625, 631-32
(9th Cir. 2007) (opinion of examining physician based on independent
clinical findings can provide substantial evidence to support
administrative conclusion of non-disability); Tonapetyan v. Halter,
242 F.3d 1144, 1149 (9th Cir. 2001) (opinion of non-examining
physician "may constitute substantial evidence when it is consistent
with other independent evidence in the record"); Andrews v. Shalala,
53 F.3d 1035, 1041 (9th Cir. 1995) (where the opinions of
non-examining physicians do not contradict "all other evidence in the
record" an ALJ properly may rely on these opinions) (citation and
emphasis omitted).

     Plaintiff faults the ALJ for rejecting Dr. Chang's more
restrictive opinions, Dr. Unwalla's opinions to the extent allegedly
inconsistent with the ALJ's residual functional capacity assessment,
and the state agency psychologists' opinions limiting Plaintiff to 1-2
step tasks.  See Plaintiff's Motion, pp. 10-12.  Generally, a treating
physician's conclusions "must be given substantial weight."  Embrey v.
Bowen, 849 F.2d 418, 422 (9th Cir. 1988); see Rodriguez v. Bowen, 876
F.2d 759, 762 (9th Cir. 1989) ("the ALJ must give sufficient weight to
the subjective aspects of a doctor's opinion. . . .  This is
especially true when the opinion is that of a treating physician")
(citation omitted); see also Garrison v. Colvin, 759 F.3d 995, 1012
(9th Cir. 2014) (discussing deference owed to the opinions of treating
and examining physicians).  Even where the treating physician's
opinions

are contradicted,[12] "if the ALJ wishes to disregard the opinion[s] of the treating physician he . . . must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."  Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987) (citation, quotations and brackets omitted); see Rodriguez v. Bowen, 876 F.2d at 762 ("The ALJ may disregard the treating physician's opinion, but only by setting forth specific, legitimate reasons for doing so, and this decision must itself be based on substantial evidence") (citation and quotations omitted). Contrary to Plaintiff's arguments, the ALJ stated sufficient reasons for discounting Dr. Chang's extreme opinions.

The ALJ appropriately gave little weight to Dr. Chang's opinions. As the ALJ stated, Dr. Chang's opinions were conclusory, inadequately supported by clinical findings, and unsupported by mental health treatment records which generally reflected mild mental status examination findings (in contrast to Plaintiff's extreme subjective complaints) (A.R. 27, 29).  Dr. Chang himself admitted that he "could not find enough information in [Plaintiff's medical] charts" to fill out the assessment form before filling out the form with extreme opinions soon thereafter (A.R. 505).  An ALJ may properly reject a treating physician's opinion where, as here, the opinion is not adequately supported by treatment notes or objective clinical findings.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir.

---

[12]  Rejection of an uncontradicted opinion of a treating physician requires a statement of "clear and convincing" reasons. Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984).

2008) (ALJ may reject a treating physician's opinion that is
inconsistent with other medical evidence, including the physician's
treatment notes); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir.
2003) (treating physician's opinion properly rejected where
physician's treatment notes "provide no basis for the functional
restrictions he opined should be imposed on [the claimant]"); see also
20 C.F.R. §§ 404.1527(c), 416.927(c) (factors to consider in weighing
treating source opinion include the supportability of the opinion by
medical signs and laboratory findings as well as the opinion's
consistency with the record as a whole).

The ALJ need not have explicitly detailed the reasons for
arguably failing to adopt some of Dr. Unwalla's opinions.  See Nyman
v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) ("Nyman") (upholding
ALJ's rejection of "the expert opinion of an examining psychologist"
despite the fact that the ALJ made the rejection "without stating his
reasons for doing so"; ALJ "was not obliged to explicitly detail his
reasons for rejecting the psychologist's opinion"); but see Garrison
v. Colvin, 759 F.3d at 1012 (stating, contrary to Nyman, that an ALJ
may reject an examining physician's opinion only "by providing
specific and legitimate reasons that are supported by substantial
evidence") (citations and quotations omitted).  If the law required
the ALJ to state specific and legitimate reasons for failing to adopt
all of Dr. Unwalla's opinions, the ALJ did so here.

The ALJ appropriately rejected Dr. Unwalla's opinion suggesting
greater limitations in the absence of treatment as overly restrictive
in light of Plaintiff's "longitudinal history of treatment, documented

mental health records, and her own testimony and reports regarding activities of daily living" (A.R. 29).  The ALJ accurately found Plaintiff's mental status presentation with Dr. Unwalla extreme compared to Plaintiff's other mental status examinations (after she started treatment) which were largely mild/normal (A.R. 29).  As the ALJ observed, Dr. Unwalla opined that Plaintiff was unable to perform activities of daily living due to her mental limitations (A.R. 348), and yet there was nothing in the record to support such an extreme opinion.  To the contrary, Plaintiff admitted the ability to prepare meals, do laundry, walk places, grocery shop, drive, and play video games (A.R. 244-47).  See A.R. 23, 29.  These inconsistencies between Dr. Unwalla's opinions and Plaintiff's own reports and the subsequent treatment record are sufficient reasons for rejecting those of Dr. Unwalla's opinions that conflicted with the ALJ's assessment.  See Tommasetti v. Astrue, 533 F.3d at 1041; Connett v. Barnhart, 340 F.3d at 875.  Moreover, Dr. Unwalla opined that, with treatment, Plaintiff's condition would significantly improve.  Such opinion supported the ALJ's decision.  See Warre v. Commissioner, 439 F.3d 1001, 1006 (9th Cir. 2006) (impairments that can be controlled effectively with treatment are not disabling).

The ALJ also appropriately rejected the state agency physicians' opinions to the extent those opinions limited Plaintiff to simple 1-2 step tasks.  Such rejection was warranted, given Plaintiff's admitted activities of daily living (which again included playing video games, making full course meals, grocery shopping and doing laundry, see A.R. 244-47), Plaintiff's medical treatment (which involved psychotropic medications that Plaintiff did not always take as prescribed, see A.R.

484, 486, 488-90, 501, 511, 523-24, 529, 535, 540-42, 544-46, 549-50, 554), and Plaintiff's mental status examination findings (which were largely normal, see A.R. 483-84, 486-89, 553) (A.R. 23, 26-28). See, e.g., Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001).

An ALJ is not required to discuss all evidence presented, and need explain why only significant probative evidence has been rejected. See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984). While Plaintiff argues contrary interpretations of the evidence, it was for the ALJ to interpret the evidence, evaluate credibility and resolve any conflicts. See Treichler v. Commissioner, 775 F.3d 1090, 1098 (9th Cir. 2014) (court "leaves it to the ALJ" "to resolve conflicts and ambiguities in the record"); Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d at 1039-40. When evidence "is susceptible to more than one rational interpretation," the Court must uphold the administrative decision. See Andrews v. Shalala, 53 F.3d at 1039-40; accord Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). The Court will uphold the ALJ's rational interpretation of the evidence in the present case notwithstanding any conflicts in the evidence.

///
///
///
///
///
///

III. **Plaintiff's Remaining Arguments are Unavailing.**[13]

Plaintiff contends that the ALJ erred in relying on the vocational expert's testimony.  <u>See</u> Plaintiff's Motion, pp. 13-14 (citing asserted conflicts between the expert's testimony and three non-DOT sources (<u>i.e.</u>, Occupational Information Network ("O*Net"), Occupational Outlook Handbook ("OOH"), and Bureau of Labor Statistics data at A.R. 312-21)).

"At Step Five, 'the Commissioner has the burden to identify specific jobs existing in substantial numbers in the national economy that [a] claimant can perform despite [her] identified limitations.'" <u>Rounds v. Commissioner</u>, 807 F.3d 996, 1002 (9th Cir. 2015) (quoting <u>Zavalin v. Colvin</u>, 778 F.3d 842, 845 (9th Cir. 2015)).  "When there is an apparent conflict between the vocational expert's testimony and the [Dictionary of Occupational Titles ("DOT")] – for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle – the ALJ is required to reconcile the inconsistency." <u>Zavalin v. Colvin</u>, 778 F.3d at 846.  A conflict is apparent only if the challenged vocational requirement is "essential, integral, or expected" for the job. <u>Gutierrez v. Colvin</u>, 844 F.3d 804, 808 (9th Cir. 2016).  No such

---

[13]   The Court has considered and rejected all of the arguments raised in Plaintiff's motion for summary judgment.  The Court discusses Plaintiff's principal arguments herein.  Neither Plaintiff's arguments nor the circumstances of this case show any "substantial likelihood of prejudice" resulting from any error allegedly committed by the ALJ.  <u>See generally</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 887-88 (9th Cir. 2011) (discussing the standards applicable to evaluating prejudice).

1   conflict is apparent in this case.

2

3       The ALJ found that a person with Plaintiff's residual functional
4   capacity could perform light, unskilled work as a production
5   assembler, router, and marker II (A.R. 31).   The vocational expert had
6   identified these jobs as consistent with the DOT, and explained that
7   the production assembly job does bench assembly work, so the job is
8   not an assembly line job (A.R. 62-63).   The Court discerns no conflict
9   between the vocational expert's testimony and the DOT.

10

11      Plaintiff points out that the jobs identified by the ALJ require
12  Reasoning Level 2 (Plaintiff's Motion, p. 8).   The vocational expert
13  and the ALJ determined that a person who is capable of simple routine
14  work can perform jobs requiring Reasoning Level 2.   Nothing in the DOT
15  conflicts with this determination.   See Rounds v. Commissioner, 807
16  F.3d at 1004 n.6 (collecting cases holding that a limitation to
17  "simple" or "repetitive" tasks is consistent with the ability to
18  perform jobs requiring Reasoning Level 2, which means the ability to:
19  "Apply commonsense understanding to carry out detailed but uninvolved
20  written or oral instructions.   Deal with problems involving a few
21  concrete variables in or from standardized situations."); see also
22  Lewis v. Berryhill, 708 Fed. App'x 919, 920 (9th Cir. 2018) (ALJ did
23  not err in finding claimant could perform job requiring Level 2
24  reasoning where claimant was limited to "work involving simple
25  instructions"); Little v. Berryhill, 708 Fed. App'x 468, 469-70 (9th
26  Cir. 2018) (limitation to jobs with Level 2 reasoning or less is
27  consistent with limitation to following "simple directions"); compare
28  Zavalin v. Colvin, 778 F.3d at 843-44 (apparent conflict exists

between limitation to "simple, routine or repetitive tasks" and "the
demands of Level 3 Reasoning").

To the extent Plaintiff may argue that the ALJ should have
included in the hypothetical questions posed to the vocational expert
the state agency psychologists' opinion that Plaintiff should be
limited to 1-2 step tasks, the Court discerns no error.  The ALJ
properly rejected a limitation to 1-2 step tasks, and instead found
Plaintiff capable of performing simple routine work (A.R. 28).
Hypothetical questions posed to a vocational expert need not include
all conceivable limitations that a favorable interpretation of the
record might suggest to exist – only those limitations the ALJ finds
to exist.  See, e.g., Bayliss v. Barnhart, 427 F.3d 1211, 1217-18 (9th
Cir. 2005); Rollins v. Massanari, 261 F.3d at 857; Magallanes v.
Bowen, 881 F.2d 747, 756-57 (9th Cir. 1989).  Here, the hypothetical
question posed to the vocational expert included all limitations the
ALJ properly found to exist (compare A.R. 22 with A.R. 62-63).  The
vocational expert testified that a person with these limitations could
perform certain jobs existing in significant numbers in the national
economy (A.R. 62-63).  The ALJ properly relied on this testimony in
finding Plaintiff not disabled.  See Barker v. Secretary of Health and
Human Services, 882 F.2d 1474, 1478-80 (9th Cir. 1989); Martinez v.
Heckler, 807 F.2d 771, 774-75 (9th Cir. 1986).

Plaintiff argues that the number of jobs the vocational expert
estimated for each position should be eroded in supposed accordance
data from O*NET and OOH (Plaintiff's Motion, pp. 13-14).  Plaintiff
argues that this data creates a conflict the ALJ should have resolved

1  (Plaintiff's Motion, p. 14).

2

3      The ALJ's duty to reconcile conflicts between a vocational

4  expert's testimony and the DOT does not extend to non-DOT sources.

5  See Shaibi v. Berryhill, 883 F.3d 1102, 1109-10 (9th Cir. 2017) ("[W]e

6  can find no case, regulation, or statute suggesting that an ALJ must

7  sua sponte take administrative notice of economic data in the . . .

8  OOH.  It is true that an ALJ is required to investigate and resolve

9  any apparent conflict between the [vocational expert's] testimony and

10 the DOT, regardless of whether a claimant raises the conflict before

11 the agency. . . .  But Shaibi cites to no authority suggesting the

12 same is true for the . . . OOH.  Our precedent holds, instead, that an

13 ALJ may rely on a vocational expert's testimony concerning the number

14 of relevant jobs in the national economy, and need not inquire sua

15 sponte into the foundation for the expert's opinion) (citations

16 omitted); see also David G. V. Saul, 2020 WL 1184434, at *5 (C.D. Cal.

17 March 11, 2020) ("courts in this circuit have consistently found that

18 an ALJ is under no obligation to resolve conflicts between VE

19 testimony and . . . O*NET data"); Wagner v. Berryhill, 2018 WL

20 3956485, at *5-6 (C.D. Cal. Aug. 14, 2018) (ALJ has no obligation to

21 address vocational expert's deviation from sources other than the DOT,

22 including the O*NET); Seaberry v. Berryhill, 2018 WL 1425985, at *6

23 (C.D. Cal. Mar. 22, 2018) (collecting cases finding that ALJ is under

24 no obligation to resolve a conflict between vocational expert

25 testimony and OOH or O*NET data).

26

27      The vocational expert properly relied on the expert's

28 professional expertise to estimate there were 58,000 production

assembler jobs, 53,000 router jobs, and 27,000 marker II jobs that a person with the limitations the ALJ found to exist could perform (A.R.62-63).  These were significant numbers on which the ALJ properly could rely.  See Gutierrez v. Commissioner, 740 F.3d 519, 527-29 (9th Cir. 2014) (holding that 25,000 jobs nationally is a significant number).  Substantial evidence supports the ALJ's decision at Step 5.

**CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: August 7, 2020.


_____
                /s/
          CHARLES F. EICK
   UNITED STATES MAGISTRATE JUDGE